**MERCY COMMUNITY HOSPITAL,**
Plaintiff-Appellant,

v.

**Margaret HECKLER, Secretary, Department of Health and Human Services,**
Defendant-Appellee.

No. 85–3133.

United States Court of Appeals,
Eleventh Circuit.

Feb. 14, 1986.

Robert E. Mazer, Baltimore, Md., for plaintiff-appellant.

Vicki L. Shulkin, Dept. of Health and Human Services, Washington, D.C., for defendant-appellee.

Before HILL and FAY, Circuit Judges, and TUTTLE, Senior Circuit Judge.

HILL, Circuit Judge:

This case involves the recapture by the defendant/appellee Secretary of Health and Human Services ("the Secretary") of certain depreciation payments made to plaintiff/appellant Mercy Community Hospital ("the Hospital"), a Medicare provider, under the Medicare Act. Those payments were originally made to the Hospital over a period of twelve years to compensate the Hospital for the consumption of its assets caused by the provision of health care services to Medicare beneficiaries. When the Hospital was sold for a price well in excess of the depreciated book value of its assets, the Secretary determined that, under the applicable statutes and regulations, she was entitled to recapture all depreciation payments made with respect to those assets to the extent of the excess of their selling price over book value. The Secretary's decision resulted in the recapture of approximately three-fourths of the depreciation payments the Hospital had received during its participation in the Medicare program, including 100 per cent of the payments made for depreciation on the hospital building and 96 per cent of the depreciation attributable to its fixed equipment. The Hospital argued that the Secretary was only entitled to recapture that portion of the depreciation payments made that reimbursed the Hospital for consumption of its assets that did not in fact occur. The

Secretary's decision was upheld by the district court. We reverse.

## FACTUAL AND LEGAL BACKGROUND

Under Part A of the Medicare program, hospitals which have executed an agreement with the Secretary and meet various other conditions imposed upon Medicare providers are reimbursed the lesser of their charges or reasonable costs incurred in providing covered services to Medicare beneficiaries. 42 U.S.C. § 1395f(b). The term "reasonable cost" of such services is defined as "the cost actually incurred, excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services." 42 U.S.C. § 1395x(v)(1)(A). The statute further provides that reasonable costs "shall be determined in accordance with regulations" promulgated by the Secretary "establishing the method or methods to be used, and the items to be included, in determining such costs." *Id.* The statute further provides that those regulations "shall (i) take into account both direct and indirect costs of providers of services ... and (ii) provide for the making of suitable retroactive corrective adjustments where, for a provider of services for any fiscal period, the aggregate reimbursement produced by the methods of determining costs proves to be either inadequate or excessive." *Id.*

Private organizations commonly act under contract with the Secretary as fiscal intermediaries to determine and issue payments to Medicare providers. *See* 42 U.S.C. § 1395h. A provider who is dissatisfied with a decision of the fiscal intermediary can appeal that decision to the Provider Reimbursement Review Board (PRRB) if the amount of reimbursement in controversy is $10,000 or more. 42 U.S.C. § 1395 *oo.* The decision of the PRRB constitutes the final decision of the Secretary, unless the Deputy Administrator of the Health Care Financing Administration (HCFA), exercising authority delegated by the Secretary, reverses, affirms, or modifies the decision of the PRRB. *Id.*

The Hospital, built in 1965, participated in the Medicare program at all times from the program's inception until the Hospital was sold on August 18, 1978. In each of those years the Hospital claimed and received an allowance for depreciation. The allowances were computed utilizing the straight line method of depreciation, the most conservative method of computing depreciation available under the regulations. *See* 42 C.F.R. § 405.415. After incurring operating losses in 1976 and 1977, the owner of the Hospital decided to sell the facility. The hospital had been underutilized and was becoming increasingly expensive to maintain. Further, periodic inspections by state health and licensing officials were resulting in the discovery of increasingly numerous and serious code deficiencies in the physical plant.

To facilitate the sale of the hospital facility, the owner obtained a detailed appraisal report. The appraiser determined that, as of a date shortly before the sale of the facility, it would have cost over $6.5 million to construct the hospital building and improvements. Because of the consumption those assets had suffered by that date, however, the appraiser found them to be worth $3,759,000. The final sale price of $5,262,500 for the land, building and equipment was based on the fair market value determination made in the appraisal report. Because the net book value of the Hospital's assets was then only $2,250,976, the owner realized a gain of more than three million dollars on the sale of the facility.

The fiscal intermediary, in its audit of the Hospital's final cost report, offset the gain realized on the sale of the assets against the depreciation previously allowed and made a net depreciation adjustment of $1,605,573. Because, on the average, 22.681 per cent of the Hospital's utilization was attributable to Medicare beneficiaries, this resulted in a net reimbursement to the Hospital for its final cost year of $364,274 less than it claimed. The intermediary made this adjustment pursuant to the regulation now codified at 42 C.F.R. § 405.415(f), which during the relevant cost year provided as follows:

> Gains and losses realized from the disposal of depreciable assets while a provider is participating in the program, or

within 1 year after the provider terminates participation in the program, are to be included in the determination of allowable cost. The extent to which such gains and losses are includable is calculated on a proration basis recognizing the amount of depreciation charged under the program in relation to the amount of depreciation, if any, charged or assumed in a period prior to the provider's participation in the program, and in the period after the provider's participation in the program when the sale takes place within 1 year after termination.

42 C.F.R. § 405.415(f) (1977).[1]

The Hospital's challenge to the intermediary's decision was adjudicated and resolved against the Hospital in an adversarial proceeding before the PRRB. A three-member majority of the Board upheld the intermediary's action; two members issued a vigorous dissent. The Deputy Administrator of the HCFA affirmed the Board majority's decision. The United States District Court for the Middle District of Florida upheld the Secretary's decision. The Hospital appeals from the decision of the district court.

## DISCUSSION

### I. *Standard of Review*

The Medicare statute directs that judicial review of a final decision by the Board, or of a reversal, affirmance or modification by the Secretary, be conducted under the Administrative Procedure Act (APA), 5 U.S.C. § 706. 42 U.S.C. § 1395oo(f). According to the APA, the reviewing court shall hold unlawful and set aside agency actions, findings, or conclusions that are "unsupported by substantial evidence" or are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(A) and (E). Those are the only bases for reversal under the APA that appellant has pressed on this appeal.

■ Where the validity of one of the Secretary's regulations is challenged, the regulation need only be "reasonably related to the purposes of the enabling legislation" to be sustained. *Springdale Convalescent Center v. Mathews*, 545 F.2d 943, 951 (5th Cir.1977) (quoting *Mourning v. Family Publications Service, Inc.*, 411 U.S. 356, 369, 93 S.Ct. 1652, 1660, 36 L.Ed.2d 318 (1973)).[2] The reviewing court is required to grant "considerable deference" to the agency's official interpretation of statutory terms, *Memorial Hospital v. Heckler*, 706 F.2d 1130, 1134 (11th Cir. 1983), and a court may not disregard such an implementing regulation "simply because it would have interpreted the statute in a different manner." *Batterton v. Francis*, 432 U.S. 416, 425, 97 S.Ct. 2399, 2405, 53 L.Ed.2d 448 (1977). A Medicare

---

1. The Secretary has stated in her brief that the methodology utilized by the intermediary in this case was codified when Regulation 405.415(f) was amended in 1979 to provide as follows:

   (1) .... If disposal of a depreciable asset results in a gain or loss, an adjustment is necessary in the provider's allowable cost. The amount of a gain included in the determination of allowable cost shall be limited to the amount of depreciation previously included in Medicare allowable costs....

   (2) (iii) .... (A) The total amount of gains and losses shall be allocated to all reporting periods under the Medicare program, based on the ratio of the depreciation allowed on the assets in each reporting period to the total depreciation allowed under the Medicare program.

   (B) The results of this allocation are multiplied by the ratio of Medicare reimbursable cost to total allowable cost for each reporting period.

   (C) The results of this multiplication are then added.

   Although the current version of Regulation 405.415(f) is not directly at issue in this case, we find it as difficult to discern any clear regulatory authority for the Secretary's position in this case in the amended version of the regulation as in the version effective during the cost years at issue in this case. We have applied the same standard of review to determine the validity of the Secretary's interpretation of Regulation 405.415(f) that we would apply to determine the validity of a regulation clearly authorizing the recapture attempted by the Secretary in this case.

2. The Eleventh Circuit has adopted as precedent all decisions by the former Fifth Circuit rendered prior to October 1, 1981. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc).

provider bears a difficult and heavy burden of proving that the Secretary's regulation conflicts with the statutory scheme. *Springdale Convalescent Center,* 545 F.2d at 951; *Johnson's Professional Nursing Home v. Weinberger,* 490 F.2d 841, 844 (5th Cir.1974).

The Hospital urges that we adopt for present purposes the distinction the Third Circuit has recognized between administrative decisions reached pursuant to interpretative rules—that is, statements made by an agency to give guidance to its staff and affected parties as to how the agency intends to administer a statute or regulation—and decisions implicating the validity of the regulations themselves. *See Daughters of Miriam Center for the Aged v. Mathews,* 590 F.2d 1250, 1258 (3d Cir. 1978).[3] Where the dispute concerns not the facial validity of a duly enacted federal regulation, but rather an agency interpretation thereof, courts in the Third Circuit "remain free to substitute their judgment for that of the agency in determining how the statute or regulation is to be implemented." *Id. See also New Jersey v. Department of Health and Human Services,* 670 F.2d 1262, 1281–83 (3d Cir.1981). As we indicate below, we find the Hospital's challenge here to be a challenge to the Secretary's interpretation of her regulations rather than a challenge to the validity thereof. We assume without deciding, however, that her decision nonetheless may only be reversed if her interpretation is not "reasonably related to the purposes of the enabling legislation." *Mourning v. Family Publications Service,* 411 U.S. at 369, 93 S.Ct. at 1661.

## II. *The Hospital's Position*

The Hospital insists that it is not challenging the validity of any regulation promulgated by the Secretary, but rather that it disputes the construction given Regulation 405.415(f) by the Secretary in this case. The Hospital claims the Secretary's interpretation of the regulation recaptures compensation paid for the consumption of the Hospital's assets as a result of its provision of covered services to Medicare beneficiaries. According to the Hospital, such a construction is contrary to the Medicare Act and implementing regulations.

According to the Hospital, the record reflects the uncontroverted fact that the Hospital building had effectively undergone fifteen years of consumption during its thirteen years of service in the Medicare program, that if the building had not been so consumed, the Hospital's assets would have been worth in excess of six million dollars instead of the approximately 3.5 million dollars for which they were appraised and sold. Accordingly, the Hospital argues, the Deputy Administrator's statement that "the provider did not incur any costs for the use of these assets" is completely unsupportable on the record.

The Hospital argues that section 405.-415(f) does not require the construction placed on it by the Secretary and is instead ambiguous concerning the way in which gains or losses upon sale of depreciable assets are to be considered. As such, it should be construed in a manner that is consistent with the Medicare Act, which requires that all reasonable costs incurred be reimbursed. The Secretary's construction, the Hospital argues, is completely inconsistent with that intent and is therefore due to be reversed.[4]

---

**3.** In the administrative proceedings in this case, as in *Daughters of Miriam Center for the Aged v. Mathews,* 590 F.2d 1250, the Secretary relied on interpretations of her regulations that may be found in the Provider Reimbursement Manual, a publication which contains the Secretary's own interpretations of her regulations. The Secretary has not relied on those guidelines on this appeal, arguing instead simply that her interpretation of the regulations in this case is reasonable in light of the statutory mandate. The principle of *Daughters of Miriam Center for the Aged,* however, would presumably apply with at least as much force in this context as it did where the Secretary's position was argued to

have been foreshadowed by guidelines contained in the Provider Reimbursement Manual.

**4.** The Hospital also argues that the Secretary's position is inconsistent with other regulations and positions she has taken in other related contexts, in which it has been recognized that depreciation allowances are intended to provide compensation for the actual exhaustion of the provider's assets and should not reflect any diminution in the fair market value of those assets occurring for other reasons. In addition, the Hospital asserts that the Secretary acts inconsistently and inequitably in recapturing depreci-

### III. *The Secretary's View*

The Secretary argues essentially that the depreciation claimed by the Hospital was appropriately recaptured because it was never "actually incurred." 42 U.S.C. § 1395x(v)(1)(A). The Secretary does not deny that the assets may have suffered wear and tear or been "consumed" while in the service of the Medicare program. The Secretary argues, however, that if the provider is to be reimbursed only for costs that are actually incurred, any gain on the sale of depreciable assets must necessarily result in the recapture of all depreciation payments made to the extent of that gain. That is because, according to the Secretary, the Hospital cannot be said actually to incurr any costs for the consumption of its assets to the extent of any profit (defined as selling price less book value at the time of the sale) it earns on those assets while they are in the service of the Medicare program.

The Secretary argues that the plain language of Regulation 405.415(f) (that "gains ... are to be included") supports her interpretation. The Secretary further claims that the Hospital's position, not the Secretary's, would thwart the statutory mandate, and that her position is consistent with the thrust of the regulatory scheme. Decisions from the Seventh Circuit and the Court of Claims appear to support the Secretary's position. *See Professional Medical Care Home, Inc. v. Harris,* 644 F.2d 589 (7th Cir.1980); *Stewards Foundation v. United States,* 654 F.2d 28, 228 Ct.Cl. 89 (1981).

### IV. *Analysis*

We construe the Hospital's challenge as a challenge not to the validity of any of the Secretary's duly promulgated regulations, but to the interpretation the Secretary has given Regulation 405.415(f) in this case. Although that regulation required that gains and losses realized on the disposal of a depreciated asset be included in determining reimbursable costs, neither it nor any other regulation specified the appropriate procedure for computing the relevant gain or loss or the appropriate method for making retroactive adjustments to allowances already paid for depreciation. Indeed, this fact was recognized by the Secretary when she amended the applicable regulation subsequent to the cost year at issue here.[5] If the Secretary's interpretation were the only plausible interpretation that might be given the otherwise ambiguous regulatory language used in Regulation 405.415(f), we might consider the Hospital's challenge to be a challenge to the validity of the regulation in spite of the facial ambiguity of its language. As we indicate below, however, the Secretary's interpretation is not the only one that could logically be given the provision at issue here. Hence we are not concerned here with the validity of a duly enacted regulation, but must instead examine the Secretary's interpretation of Regulation 405.415(f) to determine whether it is "reasonably related to the purposes of the enabling legislation." *Mourning v. Family Publications Service,* 411 U.S. at 369, 93 S.Ct. at 1661.

Congress has stated that Medicare providers shall be reimbursed for the reason-

---

ation allowances paid to the seller in a situation like this, while limiting the purchaser's depreciable basis to the current reproduction cost less straight line depreciation to the time of sale. Thus no one is reimbursed for the consumption of the asset that occurs while it is used by the original owner. We need not address these claimed grounds for finding the Secretary's construction of Regulation 405.415(f) unreasonable in this case.

5. In amending Regulation 405.415(f) (which amendment became effective March 20, 1979, after the end of the cost year in issue), the Secretary stated:

Existing regulations contain a requirement that any gain or loss realized on the disposal of a depreciable asset must be included in Medicare allowable cost computation. (See 42 CFR 405.415(f).) *The regulations, however, specify neither the procedures for computations of the gain or loss nor the methods for making adjustments to depreciation.* These amendments provide rules for the treatment of gain or loss depending on the manner of disposition of the assets.

44 Fed.Reg. 3980 (Jan. 19, 1979) (emphasis added).

able costs, both direct and indirect, they incur in rendering health care services to Medicare beneficiaries. 42 U.S.C. §§ 1395f(b), 1395x(v)(1)(A). *See Northwest Hospital, Inc. v. Hospital Service Corp.*, 687 F.2d 985, 989 (7th Cir.1982) ("The statutory touchstone is the reimbursement of actual costs, both direct and indirect, found to be not unnecessary to the efficient delivery of needed health services."). That is the purpose that must be served by the regulations at issue in this case, as well as any interpretations thereof.

As the Secretary's regulations acknowledge, the consumption of long-lived assets that occurs during and as a result of their use in the service of the Medicare program is a reimbursable cost of providing the Medicare services thereby made possible. *See Springdale Convalescent Center*, 545 F.2d at 953. *See* 42 C.F.R. §§ 405.402(c), 405.402(d) & 405.415. Further, the costs associated with the consumption of such long-lived assets are "actually incurred" when the assets themselves are consumed, as that is when the provider is irretrievably deprived of the consumed portion of its assets. Thus those costs are reimbursed periodically in the form of the depreciation allowances the Secretary seeks to recapture in this case. *See* 42 C.F.R. § 405.415.[6]

The subsequent sale of the unconsumed remainder of the depreciable assets at a price in excess of their depreciated book value does not necessarily imply, as the Secretary seems to argue, that the provider did not actually incur some portion of the costs it was reimbursed for the consumption of the asset before it was sold. It may indeed be the case that, upon the sale of a long-lived asset, it will become apparent that some or all of the excess of selling price over depreciated book value reflects some miscalculation of the consumption of the asset that actually occurred while it was in the service of the Medicare program. Where, for example, depreciation allowances paid turn out to have been based on an erroneous estimate of the asset's useful life or a method of depreciation that does not accurately reflect the actual rate of consumption of the asset over its useful life, the recapture of some portion of those allowances pursuant to Regulation 405.415 may be appropriate.

A gain on the sale of depreciable assets might result from other factors, however, that cannot possibly be said to suggest that the provider was overcompensated for consumption that occurred or compensated for consumption that did not occur. An increase in the demand for the provider's assets, for example, may cause the market value of the unconsumed remainder of the provider's assets to increase, although they are still being consumed at precisely the rate used to calculate the depreciation allowances that are paid under the Medicare program. The monetary value of depreciable assets may also increase as the assets are being consumed simply because of the effect on market values of inflation. An increase in the market value of those assets due to changing market conditions or inflation in no way suggests, however, that depreciation allowances claimed for the consumption of the assets were excessive. Rather, an increase in the market value of the unconsumed remainder of the provider's depreciable assets each year more plausibly suggests that the depreciation allowances paid by the Medicare program

---

**6.** The treatment of depreciation is consistent with the position taken by the regulations governing the reimbursement of costs incurred for leasing and renting capital assets. As a general rule, a bona fide leasing or rental arrangement will result in the reimbursement of all lease or rental payments made to secure the services of long-lived assets as long as the assets would be depreciable if the provider owned them outright. 42 C.F.R. § 405.414(b). The periodic rent paid on such assets can be expected necessarily to include an allowance for depreciation, with the result being that the federal government reimburses those who supply capital assets for use in the Medicare program for the consumption of those assets either, directly, if the assets are owned by the provider, or indirectly, if the assets are simply rented or leased. Neither arrangement is favored by the regulations. This consistency avoids creating perverse economic incentives that would encourage providers to purchase capital assets when, if not for the effect of the reimbursement regulations, renting them would make more sense economically.

*under*-compensated providers for the use and consumption of their increasingly valuable assets each year. Depreciation allowances, as currently calculated, ordinarily assume that the unconsumed remainder of the provider's assets will not increase in value each year as the assets are being consumed. If, however, the market value of the assets is increasing each year, the provider in fact incurs a greater cost each year by leaving the assets in the service of the Medicare program, even if the rate of consumption of the assets remains the same. This would suggest that, in light of the statutory mandate, the depreciation allowances paid should increase each year as well.[7]

■ An excess of the market value or sales price of depreciable assets over their book value thus might represent (1) depreciation allowances claimed that did not accurately reflect the actual consumption of those assets, (2) an inflationary increase in the market value of the unconsumed remainder of those assets, (3) investment gains due simply to supply and demand characteristics of the marketplace, or (4) some combination thereof. The Secretary's position in this case recognizes no distinction between gains on the sale of depreciable assets that are allocable to the first factor above, and which thus may appropriately be recaptured, and gains resulting from other factors that do not in any way suggest or imply that the provider has been compensated for any consumption of its assets that did not in fact occur. To the extent that inflation or market supply and demand characteristics are responsible for the excess of sales price over book value in a transaction such as occurred in this case, the Secretary's position retroactively deprives providers of reimbursements made for the consumption of their assets without regard to whether those payments in fact

overcompensated the provider for reasonable costs actually incurred. Such an interpretation of Regulation 405.415(f) is clearly contrary to the statutory mandate. Because the Secretary's interpretation is not "reasonably related to the purposes of the enabling legislation," *Mourning v. Family Publications Service*, 411 U.S. at 369, 93 S.Ct. at 1661, her decision in this case must be reversed.

### CONCLUSION

For the reasons set forth above, the decision of the district court is REVERSED, and the case is REMANDED for further proceedings not inconsistent with this opinion.

---

7. This result would maintain the consistency noted earlier, *see supra* note 6, between the treatment afforded those who own assets on which depreciation allowances are paid and those who rent them. Rental payments on depreciable assets whose market value is increasing as they are being consumed can be expected to increase in each year in which the market value of the assets increased. If depreciation

payments made to compensate for the consumption of increasingly valuable assets owned by providers do not similarly increase, medicare reimbursement policies will for no apparent reason favor rental arrangements over ownership of depreciable assets, assuming some other upward adjustment in reimbursements is not made.