**HOODKROFT CONVALESCENT CENTER, INC., et al., Plaintiffs, Appellants,**

v.

**STATE OF NEW HAMPSHIRE, DIVISION OF HUMAN SERVICES, et al., Defendants, Appellees.**

No. 89–1083.

United States Court of Appeals, First Circuit.

Heard May 3, 1989.

Decided July 14, 1989.

---

E. Donald Dufresne with whom Amy L. Ignatius and Devine, Millimet, Stahl & Branch Professional Ass'n were on brief for plaintiffs, appellants.

Gretchen Leah Witt, Asst. U.S. Atty., with whom Peter E. Papps, Acting U.S. Atty., was on brief for defendant, appellee Dr. Otis R. Bowen, M.D., Secretary of the Dept. of Health and Human Services.

Susan S. Geiger, Asst. Atty. Gen., Civ. Bureau, with whom John P. Arnold, Atty. Gen., was on brief for defendant, appellee State of N.H., Div. of Human Services.

Before BOWNES and BREYER, Circuit Judges, and GRAY,* Senior District Judge.

* Of the Central District of California, sitting by

BREYER, Circuit Judge.

## I.

### Background

The federal Medicaid program provides money for the states to pay for medical care for needy and disabled people. *See* Title XIX of the Social Security Act, 42 U.S.C. § 1396. A state receiving federal Medicaid funds must administer them according to a "state plan" that meets federal standards. 42 U.S.C. § 1396a. Under the plan, the state will reimburse nursing homes and other Medicaid facilities for the cost of caring for Medicaid-qualified patients. 42 U.S.C. § 1396a(a)(13). The federal Medicaid statute says that states must

> provide for payment ... of ... services provided under the plan through the use of rates ... which the State finds, and makes assurances satisfactory to the Secretary, are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities.

42 U.S.C. § 1396a(a)(13)(A).

The State of New Hampshire, like other states and the federal government, considers that "depreciation" of buildings and equipment is one of the allowable "costs" of providing care. New Hampshire Medical Assistance Manual § 9999.7b(1); *cf.* 42 C.F.R. § 405.415(a) (corresponding federal Medicare regulation) (now renumbered § 413.134(a)). New Hampshire calculates depreciation according to a standard accounting method, dividing an asset's purchase price (say, $300,000) by its estimated useful life (say, 30 years), and reimbursing the facility for the resulting annual depreciation ($10,000 each year for 30 years). *See* Medical Assistance Manual § 9999.7b(1)(a); *cf. Richey Manor, Inc. v. Schweiker,* 684 F.2d 130, 135 (D.C.Cir.1982) (same method of calculating depreciation applies under 42 C.F.R. § 405.415). If the facility sells the asset, New Hampshire, like the federal government and other states, "recaptures" the depreciation it has paid, to the extent that the sale price exceeds the depreciated

designation.

original cost of the asset (*i.e.,* the original purchase price less all depreciation payments made before the sale). *See* Medical Assistance Manual § 9999.7b(1)(d); *cf.* 42 C.F.R. § 405.415(f)(1); Idaho Code 56–104 (1988); Kansas Admin.Reg. 30–10–25(3) (1987); Minn.Stat. § 256B.431(3b) (1988); Ohio Admin.Code 5101:3–3–28 (1988); Va. Code 32.1–329 (1988).

In 1974 the Hoodkroft Convalescent Center began using its building and nursing equipment to participate in the Medicaid program. Over the years New Hampshire paid the Center about $173,000 for depreciation. In 1985 the Center sold the building and equipment, making a profit of about $2 million over the original purchase price. The state would like its depreciation payments back. But, the Center, and its owner, do not wish to pay, and they have brought this declaratory judgment action (removed from state to federal court) attacking the legality of the recapture rule on constitutional and statutory grounds as vague and unfair. We shall consider the Center's basic arguments in turn.

## II.

### *Vagueness*

■ The Center argues that the state's recapture rules are so vague and confusing that they violate the Fifth Amendment of the federal Constitution. We shall for the moment postpone consideration of the constitutional basis for the Center's claim and simply assume that the Medicaid statute itself, in directing the states to set rates, implicitly requires that the rules and regulations embodying those rates be coherent and comprehensible to the facilities regulated. *Cf. Harris v. McRae,* 448 U.S. 297, 311 n. 17, 100 S.Ct. 2671, 2685 n. 17, 65 L.Ed.2d 784 (1980) (quoting *Broadrick v. Oklahoma,* 413 U.S. 601, 608, 93 S.Ct. 2908, 2914, 37 L.Ed.2d 830 (1973)) (test for unconstitutional vagueness is whether an "ordinary person exercising ordinary common sense can sufficiently understand and comply with" a law).

In our view, New Hampshire's depreciation recapture regulations, while written in a technical style, adequately convey the basic rule. In 1986, when New Hampshire's Division of Human Services, the agency that administers the Medicaid program, *see* N.H.R.S.A. 161:2, VIII, tried to recapture the depreciation payments here at issue, its recapture rule read as follows:

> If any property is sold at a gain for which Medicaid reimbursement for depreciation has been received, such gain shall be subject to recapture. The extent to which any such reimbursement is recaptured shall be determined by the Bureau of Provider Audits and Rate Setting.

He–W [Health–Welfare regulation] 504.-18(p)(6)(b)(1)(iii). This general regulation thus refers to the Bureau of Provider Audits and Rate Setting for a more detailed determination of the extent of recapture. That Bureau uses the Division of Human Services' Medical Assistance Manual. That Manual says (and has said at least since 1977, when the state began making the depreciation payments here at issue) that:

> If any property is sold at a gain for which Medicaid reimbursement for depreciation has been received, such gain shall be subject to recapture. The extent to which any such reimbursement is recaptured is calculated based on [federal Health Insurance Manual] Section 132, Gains and Losses on Disposal of Depreciable Assets (Excluding Casualty Losses).

Medical Assistance Manual § 9999.7b(1)(d). The state Medical Assistance Manual thus cross-references the federal Health Insurance Manual § 132, which says

> The net depreciation adjustment on the disposition of depreciable assets includes: (1) *the amount of the gain or loss,* (2) indirectly, the depreciation adjustment on those assets acquired prior to entrance into the program, and (3) depreciation taken in excess of straight line depreciation.... With respect to a gain on disposition, *the net depreciation adjustment will be limited to the amount of depreciation accumulated for that asset under the program.*

Health Insurance Manual § 132(C) (first emphasis added; second emphasis in original) (now renamed Provider Reimbursement Manual § 132(C)). This federal man-

ual goes on to provide several examples showing how to calculate depreciation adjustments. *See* HIM §§ 132.1–132.2. These provisions of the federal Health Insurance Manual implement the Medicare regulation analogous to the state's Medicaid recapture rule, which says:

If disposal of a depreciable asset results in a gain or loss, an adjustment is necessary in the provider's allowable cost. The amount of a gain included in the determination of allowable cost shall be limited to the amount of depreciation previously included in Medicare allowable costs. The amount of a loss to be included shall be limited to the undepreciated basis of the asset permitted under the program.

42 C.F.R. § 405.415(f)(1). Although these rules and regulations require the reader to look up various cross-references, taken as a whole they are reasonably clear and specific. They are the kind of rules that the Center's lawyers or accountants ought to understand.

The Center says that confusion arises because the state Medical Assistance Manual uses the word "recapture" of depreciation, while the federal Health Insurance Manual that it cross-references uses the word "adjustment" instead. But the difference simply reflects the fact that the federal Manual governs not only recapture of depreciation payments when the owner sells the property at a gain, but also payment of additional depreciation when the owner sells the property at a loss. *See* 42 C.F.R. § 405.415(f)(1). The Center also finds confusion in the fact that, from 1976 to 1984, the state's He–W regulation used the same language as the state Manual uses now. In 1984 the state amended it to say that the amount of recapture "shall be determined by the Bureau of Provider Audits," instead of saying that it shall be "calculated based on HIM Section 132." This change, however, does not make the rules vague or contradictory. The state He–W regulation now simply designates the entity responsible for calculating the amount of recapture; the *method* of calculation to be followed by the Board is still stated in the Manual.

There are two other reasons why the Center should have understood the reimbursement ground rules, including the rules providing for depreciation recapture. First, the Center signed a reimbursement contract with the state. In that contract, it promised to "abide by all rules and regulations promulgated by the Division of Human Services pertaining to the ... claiming of payments." Both the He–W regulation and the Medical Assistance Manual provision on recapture are "rules and regulations promulgated by the Division of Human Services." Second, a substantial body of case law interprets the federal regulations to which New Hampshire's rules refer, making it clear that they provide for depreciation recapture and how they do so. *See, e.g., Richey Manor,* 684 F.2d at 135 (under 42 C.F.R. § 405.415(f), "if the selling price is higher than the cost basis, a gain is recognized, and Medicare recaptures the amount by which depreciation reimbursements exceeded actual depreciation"); *Sumner v. United States,* 678 F.2d 202, 206, 230 Ct.Cl. 555 (1982); *Professional Medical Care Home, Inc. v. Harris,* 644 F.2d 589, 592 (7th Cir.1980); *Gosman v. United States,* 573 F.2d 31, 35, 215 Ct.Cl. 617 (1978); *Adventist Living Centers, Inc. v. Bowen,* 686 F.Supp. 680, 683 (N.D.Ill. 1988); *Hillhaven Corp. v. Schweiker,* 570 F.Supp. 248, 250 (M.D.La.1983).

All this is to say that the government gave Hoodkroft more than adequate notice about the rules of the game, through the use of language that, though technical, an "ordinary person exercising ordinary common sense," *Harris,* 448 U.S. at 311 n. 17, 100 S.Ct. at 2685 n. 17, would understand. Thus, the State violated neither the federal statute, nor the Constitution's prohibition against taking "property" without due process of law. (This is so even if we assume that the Center had an "entitlement" to, and hence a property interest in, the depreciation payments, *see Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972), which assumption, since the state set forth its recapture rules clearly from the beginning, we very much doubt.)

## III.

### Fairness

■ The Center's more important argument focuses on the federal Medicaid statute's requirement that the state set "rates ... reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities." 42 U.S.C. § 1396a(a)(13)(A). Hoodkroft says that the wear and tear suffered by its building and equipment, over eight years, is such a "cost;" that the gain from the sale of that property reflected only inflation, not an absence of wear and tear; and that, by recapturing the depreciation, the state unlawfully set a rate that was not "reasonable and adequate to meet" this cost of wear and tear.

To return to our example, assume that a nursing home bought equipment with a 30 year expected useful life for $300,000. It would depreciate the equipment for 30 years at a rate of $10,000 per year. Suppose that after 10 years, when the depreciated value of the equipment was only $200,000, the facility sold it for $600,000. The equipment, says the facility, is still used up and in bad condition; the high price reflects only inflation. Indeed, the facility says, the same equipment in perfect condition would sell, in Year Ten, for $900,000 (since prices between Year One and Year Ten have trebled due to inflation). So, in its view, the wear and tear deprived it of an additional $300,000 profit. Yet the recapture rule would take back the $100,000 the facility received for depreciation between Year One and Year Ten. The Center says the recapture rule is, therefore, unfair, to the point where it is not "reasonable and adequate" to compensate the Center for its necessary costs of operation, as 42 U.S.C. § 1396a(a)(13)(A) mandates. At the least, the Center says, the state must interpret its recapture rule so as to exempt, on a case-by-case basis, gains that are proven to reflect only inflation, rather than a lack of actual wear and tear.

The Eleventh Circuit has accepted a version of this argument. It has held that the federal recapture regulation, 42 C.F.R. § 405.415(f)(1), violates the Medicare statute's similar mandate to reimburse health care providers for all reasonable costs. *Mercy Community Hospital v. Heckler*, 781 F.2d 1552 (11th Cir.1986). The court reasoned that, because the recapture rule fails to distinguish between gains that merely reflect "inflation or market supply and demand characteristics," and gains that reflect a lack of depreciation, it "deprives providers of reimbursements made for the consumption of their assets without regard to whether those payments in fact overcompensated the provider for reasonable costs actually incurred." *Id.*, 781 F.2d at 1558. The Seventh Circuit and the Court of Claims, however, have held to the contrary. *See Professional Medical*, 644 F.2d at 592–94; *Stewards Foundation v. United States*, 654 F.2d 28, 34, 228 Ct.Cl. 89 (1981).

We think the latter decisions are correct. In our view, the state and federal recapture rules represent a reasonable, and therefore lawful, interpretation of the Medicaid statute, for the following reasons.

First, 42 U.S.C. § 1396a(a)(13)(A) says that the state plan must use rates that "the *State finds*, and makes assurances *satisfactory to the Secretary*, are reasonable and adequate." The statute, explicitly, and relevant principles of administrative law, implicitly, give to the State and the Secretary broad legal power to determine the scope of the statutory words "reasonable and adequate." *See Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984) ("considerable weight should be accorded to an [agency's] construction of a statutory scheme it is entrusted to administer"); *International Brotherhood of Teamsters v. Daniel*, 439 U.S. 551, 566 n. 20, 99 S.Ct. 790, 800 n. 20, 58 L.Ed.2d 808 (1979); *Mayburg v. Secretary of Health & Human Services*, 740 F.2d 100, 106 (1st Cir.1984). Here, both the Secretary, in promulgating a recapture regulation for Medicare, *see* 42 C.F.R. § 405.415(f)(1), and the State in its own rulemaking, have taken the view that the recapture rule is consistent with § 1396a(a)(13)(A). Indeed, Congress itself

has provided some indication that the recapture rule is consistent with the purposes of the Medicaid statute, for Congress, in 1984, amended the Medicare Act, but told the Secretary to "provide for recapture of depreciation in the same manner as provided under the regulations in effect on June 1, 1984," that is, in the same manner as under 42 C.F.R. § 504.515(f). 42 U.S.C. § 1395x(v)(1)(O)(ii); *see* 1984 U.S.Code Cong. & Admin.News 2026 (under the new statute, the "Secretary would be required to continue recapture of depreciation as under current reimbursement policy").

Second, the law can, and often does, use the concept of "depreciation costs" to refer not to a physical fact (*e.g.*, that a piece of equipment is worn), nor to an economic fact (*e.g.*, that wear and tear makes it less valuable than a new piece of equipment), but rather to an accounting fact, namely, a certain percentage of the nominal, historical price paid for the item. Of course, the percentage is not totally arbitrary; it should in general reflect the economic fact that the value of equipment will sink to zero over time. But since it is difficult to devise a depreciation formula that will accurately reflect short-run changes in economic value, a depreciation allowance typically "represents, not the actual changes in value from year to year but a stylized allowance for a downward trend." J. Bonbright, A. Danielsen & D. Kamerschen, *Principles of Public Utility Rates*, 276 (1988); *see also Montana Power Co. v. F.E.R.C.*, 599 F.2d 295, 300 (9th Cir.1979) ("Because the market value of assets seldom changes precisely in accordance with depreciation, depreciated original cost often is not an accurate proxy of current fair market value"); A. Kahn, *The Economics of Regulation* I, 27, 32 (1988). This "stylized allowance" promises no more than that an investor will eventually receive back the historical, nominal dollars that he invested in an asset.

Indeed, the Internal Revenue Code uses a similar "stylized" approach when it measures taxable gain as nominal dollar profit upon resale of property, and disregards the possibility that a nominal gain upon sale may be due only to inflation, *see* 26 U.S.C. §§ 1001(a), 1011(a), 1012, 1016(a)(2) (taxable gain on sale of property is the difference between sale price and "adjusted basis" (*i.e.*, original cost less depreciation)), and when, in certain circumstances, it taxes the "recaptured depreciation" portion of a gain at higher "ordinary income" rates. 26 U.S.C. § 1245(a) (gain from sale of certain depreciable assets is "ordinary income," up to the amount of past depreciation taken as tax deductions). These provisions of the Internal Revenue Code, like New Hampshire's recapture rule, do not distinguish between dollar gains due to less-than-expected wear and tear, and those due only to inflation.

Third, New Hampshire's recapture rule is similar to rules that regulators traditionally apply to public utilities. The regulatory system typically promises the regulated firm only a reasonable dollar profit calculated as a percentage of investment, as measured by historical, nominal dollar costs. Bonbright, *supra*, at 212, 305 (the "original-cost or net-investment principle of ratemaking" is the majority rule, and this principle "goes a considerable distance toward establishing the relevant tests of a fair rate of return"); Kahn, *supra*, at I, 41, 89 (most states use a rate base "representing actual money outlays;" the "traditional and still generally followed approach of public utility regulation ... assur[es] a reasonable gross return on the existing investment"). Consistently with that basic premise, utility regulators typically measure depreciation, as does New Hampshire, in terms of a percentage of nominal historical dollars invested in an asset. Bonbright, *supra*, at 276–77 (the depreciation method "now most generally applied by public utilities, amortizes the costs of assets (minus net salvage) through equal annual charges over estimated service lives"); Kahn, *supra*, at I, 117 (typical current practice in utilities regulation is to calculate the utility's yearly depreciation allowance by prorating the historic cost of its assets over their "total estimated economic life"); *see, e.g.*, Mass.Gen.Laws Ann. Ch. 164 § 57 (gas and electric companies can include in rate base "an amount for depreciation equal to

three per cent of the cost of the plant"). Regulators typically do not adjust the cost basis of an asset to reflect inflation. *See* Kahn, *supra,* at I, 109–116 (discussing problem that original cost ratemaking does not take inflation, and other economic factors, into account); Bonbright, *supra,* at 342–48 (same).

And, if the utility later sells the asset at a profit, the ratepayer, not the utility, has been held entitled to receive the benefit of the gain, at least to the extent of recapturing past depreciation allowances. *See AT & T Information Systems, Inc. v. F.C.C.,* 854 F.2d 1442, 1444 (D.C.Cir.1988) (because "ratepayers generally assume the risk of loss on depreciable assets used in a utility's operations," they "have the superior claim to capital gains achieved on depreciable assets"); *Democratic Central Committee v. Washington Metropolitan Area Transit Commission,* 842 F.2d 402, 412 (D.C.Cir. 1988) ("farepayers should receive the benefit of the actual gain" on sale of depreciable property); *Bebchick v. Washington Metropolitan Area Transit Commission,* 645 F.2d 1086, 1090 (D.C.Cir.1981) ("in recovering depreciation Transit's investors are entitled to recover no more or less than their [historic] cost"); *Montana Power Co.,* 599 F.2d at 300; *Democratic Central Committee v. Washington Metropolitan Area Transit Commission,* 485 F.2d 786, 795 (D.C.Cir.1973) (when a utility sells depreciable property at a gain, the gain is used " 'to reduce the depreciation expenses which ratepayers have paid but which the company, because of the gain, does not actually incur' "); *Washington Public Interest Organization v. Public Service Commission,* 393 A.2d 71, 74 (D.C.App. 1978) ("ratepayers, who have been charged for depreciation of plant facilities, should be repaid with the gains, if any, upon eventual sale of those facilities"); *Maine Water Co. v. Public Utilities Commission,* 482 A.2d 443, 448 (Me.1984) ("customers of a utility that sells at a gain *depreciable* property ... have a right to have that gain applied to reduce their future rates"); *South County Gas Co. v. Burke,* 551 A.2d 22, 24–25 (R.I.1988) (upholding commission's ruling that a portion of sale profits

reflecting "the amount that the ratepayers paid toward the depreciation expense of the property" should go to reduce future rates); *Rate Case of Commonwealth Electric Co.,* No. DPU 88–135/151, 90–94 (Mass. Dept. of Public Utilities, Jan. 31, 1989) (when utility sells depreciable assets at a price that exceeds their net book value (historic cost minus depreciation) the gain goes to reduce future rates).

This regulatory practice seems relevant because one basic purpose of the Medicaid program, like utility regulation, is to keep rates at reasonable levels. *See* 42 U.S.C. § 1396a(a)(13)(A) (limiting rates to those adequate for "efficiently and economically operated facilities"). And, the Medicaid program, like utility regulation, gives participating facilities a guarantee that they will, at least, recover nominal, historical dollars invested. These similarities seem great enough to warrant a similar conclusion about the reasonableness of comparable cost measuring rules.

Fourth, the main reason that utility regulators, and presumably Medicaid administrators, use historical, nominal dollars to calculate depreciation and other costs is administrative efficiency. To try to measure the current value of a facility each year; to try to assess the actual yearly economic losses caused by equipment wear and tear; to try to determine the extent to which any gain on resale reflects (a) less-then-expected wear and tear, (b) inflation, or (c) special market factors such as shortages, all would pose formidable administrative difficulties. Consider, for example, the conflicting evidence and expert testimony that parties might tender on such matters. Justices Brandeis and Holmes described these difficulties convincingly in their attack on the "fair value" ratemaking rule of *Smyth v. Ames,* 169 U.S. 466, 18 S.Ct. 418, 42 L.Ed. 819 (1898), in *State of Missouri ex rel Southwestern Bell v. Public Service Commission,* 262 U.S. 276, 289–312, 43 S.Ct. 544, 547–555, 67 L.Ed. 981 (1923) (Brandeis & Holmes, JJ., dissenting). It is not surprising that the law has come to reflect Justices Brandeis' and Holmes' position. *See Federal Power Commission v.*

*Hope Natural Gas Co.*, 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944) (rejecting "fair value" approach and, in effect, permitting regulatory commissions to use original cost basis in ratemaking).

Fifth, it is difficult to say that the "historical cost" system, despite its failure to take inflation into account, is seriously unfair, as long as a facility and its investors understand the ground rules in advance. *Cf.* Kahn, *supra*, at I, 115–16 (any scheme of compensation is fair to utility investors if they are informed of its terms in advance, including whether or not it will protect them from inflation). It is not unfair to treat a facility rather like a bondholder, who lacks protection against inflation but enjoys security of nominal dollar return. New Hampshire, through Medicaid, simply guarantees its nursing homes that they will recover the actual dollar costs of their investment in buildings and equipment. (Indeed, it also lets them keep any dollar profit on resale remaining after they pay back the taxpayer for depreciation payments.) To require this recapture is to say that the nursing home can recover nominal dollars invested but once, not twice, irrespective of inflation. That is, reimbursement for depreciation purports only to replace, over time, the original, historic cost of the asset, so, if the asset does not in fact fall to zero value over time, but instead is resold at a profit, then its original cost is recovered by the resale and, by definition, no "depreciation" has occurred. New Hampshire has simply fashioned a reimbursement system that is indifferent as to whether the dollars that reimburse come from inflation, special economic conditions, less-than-expected wear and tear, or any other source. Although there are obvious fairness problems that arise whenever a tax, regulatory, or cost reimbursement system is indifferent to inflation in this way, if the parties know in advance that the rules treat them somewhat like investors in bonds, we cannot say the unfairness is great enough to make the depreciation recapture rule unreasonable.

In sum, given the breadth of the Medicaid's statute's delegation to the states and the Secretary to determine what

counts as a "reasonable" system for reimbursing costs, the analogies with treatment of depreciation elsewhere in the law, the reasons of administerability that argue for the use of nominal, historic cost-based rate system, and the lack of any unfair surprise, we agree with the Seventh Circuit and the Court of Claims that New Hampshire's Medicaid recapture rule is within the boundaries of the Medicaid statute, and is therefore lawful.

For these reasons, the judgment of the district court is

*Affirmed.*