WHITECLIFF, INC., Appellant,

v.

Donna E. SHALALA, in her Official Capacity as Secretary of the U.S. Department of Health and Human Services, Appellee.

No. 92-5341.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 13, 1994.

Decided April 12, 1994.

Robert E. Mazer, Baltimore, MD, argued the cause for appellant. With him on the brief was Leonard C. Homer, Baltimore, MD, Deborah M. Mulligan, Washington, DC, and Charles M. English, Washington, DC, entered appearances.

Kathleen M. Scully–Hayes, Attorney, U.S. Dept. of Health and Human Services, Washington, DC, argued the cause for appellee. With her on the brief was Eric H. Holder, Jr., U.S. Atty., Washington, DC. Robert L. Roth, Attorney, U.S. Dept. of Health and Human Services, Washington, DC, entered an appearance.

Before: SILBERMAN, SENTELLE and HENDERSON, Circuit Judges.

Opinion for the Court filed by Circuit Judge SILBERMAN.

SILBERMAN, Circuit Judge:

Appellant, an operator of a skilled nursing facility, challenges the Secretary's regulations interpreting the Medicare statute as they relate to depreciation. We agree with

appellant and reverse the district court with instructions to remand to the agency.

## I.

In return for providing covered services to Medicare beneficiaries, Medicare program providers, such as Whitecliff, are reimbursed the lesser of their "customary charges" or their *"reasonable costs* of such services." 42 U.S.C. § 1395f(b)(1) (1988) (emphasis added). Reasonable cost is defined as "the cost actually incurred, excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services." 42 U.S.C. § 1395x(v)(1)(A) (1988). The Secretary of Health and Human Services has promulgated regulations that further define the scope of "reasonable cost" under that subsection. *See, e.g.,* 42 C.F.R. § 405.415 (1982).

One such regulation states that "depreciation on buildings and equipment used in the provision of patient care is an allowable cost." 42 C.F.R. § 405.415(a) (1982). But the regulation authorizes the Secretary to "recapture" depreciation payments made to a provider, at the time of the sale of the depreciated asset, if there has been a gain on the sale of the asset. "If disposal of a depreciable asset results in a gain or loss, an adjustment is necessary in the provider's allowable cost." 42 C.F.R. § 405.415(f)(1) (1982).

The Secretary interprets her regulation to mean that where a depreciable asset is sold for more than its depreciated basis, there has been a gain, signaling that previous periodic depreciation payments have been too generous. To effectuate the statutory requirement that only costs actually incurred by providers be compensated, prior depreciation payments are recaptured to reflect the new understanding that the assets have not depreciated as much as thought. If the gain is large enough, all the depreciation payments may be recaptured. 42 C.F.R. § 405.415(f)(1) (1982). In such situations, under the Secretary's view, the asset has not depreciated at all but, in fact, has appreciated while in use.

Thus, there has been no cost associated with the use of the asset in the provision of Medicare services.

Payments to Medicare providers are not usually made directly by the Secretary. Rather, private fiscal intermediaries, such as Blue Cross and Blue Shield, under contract with the Secretary, make such payments. 42 U.S.C. § 1395h (1988). Interim payments to providers are made at least monthly, 42 U.S.C. 1395g(a) (1988), but a yearly reckoning takes place to determine whether interim payments have been in line with the reasonable costs of Medicare services provided. *Id.;* 42 C.F.R. § 405.454(a)(1), (f) (1982). Should a provider be dissatisfied with the intermediary's decision, it can appeal to the Provider Reimbursement Review Board (Board). 42 U.S.C. § 1395oo (a) (1988). The Board's decision is final agency action unless the Secretary, within 60 days, chooses to reverse, affirm, or modify the decision. 42 U.S.C. § 1395oo (f)(1) (1988).

Appellant operated a skilled nursing facility from December 1966 to April 26, 1982, all the while receiving payments *inter alia* for depreciation from Medicare pursuant to 42 C.F.R. § 405.415(a) (1982). On April 26, 1982, Whitecliff's nursing facility, Whitecliff Manor, was sold for $1,400,000, of which $1,232,500 was allocated for the buildings and improvements. Based on the sales price for these depreciable assets, the intermediary, Blue Cross and Blue Shield Association/Community Mutual Insurance Co., calculated that the gain on appellant's asset had been $865,-964 ($1,232,000 minus the depreciated basis of $366,536). From this gain, the intermediary determined that $218,882 ought to be recaptured. This figure represented Medicare's share of the appellant's depreciation expenses while participating as a provider.

Whitecliff appealed to the Board, arguing that the intermediary's recapture decision was contrary to the Medicare statute, since the recapture would preclude Whitecliff from receiving payments for actual costs incurred in providing Medicare service.[1] The Board

---

1. Note that the Deficit Reduction Act of 1984, Pub.L. No. 98–369, § 2314(a), codified at 42 U.S.C. § 1395x(v)(1)(O)(ii), ratified the recapture of depreciation regulations that were in effect as of June 1, 1984. Congress' ratification of the Secretary's regulations in 1984, however, has no bearing here because all events relevant to the

disagreed and determined that there had been a gain on the sale and that recapture was appropriate both under the statute and the appropriate regulations. Relying upon *Hoodkroft Convalescent Ctr., Inc. v. New Hampshire*, 879 F.2d 968 (1st Cir.1989), *cert. denied*, 493 U.S. 1020, 110 S.Ct. 720, 107 L.Ed.2d 740 (1990), and rejecting the logic of *Mercy Community Hosp. v. Heckler*, 781 F.2d 1552 (11th Cir.1986), the Board concluded that the concept of depreciation was merely a device for allocating the cost of an asset over its useful life. Where the value of an asset did not decline, but instead actually rose, even in nominal terms, there was no cost associated with using that asset. In such situations, it was entirely appropriate for the intermediary to recapture depreciation payments because there had been no cost associated with depreciation.

After the Secretary declined to revisit the Board's decision, Whitecliff filed suit in the district court reiterating the same arguments it had made before the Board and also asserting that the statute prohibited retroactive adjustments in depreciation payments. Whitecliff sought to have the Board's decision to recapture set aside and asked that the district court compel the Secretary to revise the intermediary's decision regarding the recapture of depreciation payments. The Secretary moved for summary judgment on appellant's suit and filed a counterclaim for $218,882, which was the sum of the past amounts paid by the Secretary to Whitecliff for the depreciation costs associated with providing Medicare services.

The district court granted the Secretary's motion for summary judgment. The court observed that the regulation that permitted the Secretary to recoup payments made in the past was only applied prospectively and thus was not retroactive within the meaning of *Bowen v. Georgetown University Hospital*, 488 U.S. 204, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988). The court also noted that the Secretary has broad authority to determine the breadth of the term "reasonable cost." The Secretary's determination that there

were no depreciation costs for Whitecliff Manor was not in contravention of the statutory requirement that costs incurred be paid to providers. The agency had reasonably concluded that the sale of the facility for much more than the depreciated basis meant that there had been no need for depreciation payments over the years. While acknowledging that the Secretary's emphasis on the sales price did not take market factors or inflation into account, the district court thought that the Secretary had complied with the statute since the Secretary had broad statutory authority to determine the scope of the "cost actually incurred."

The court, in a separate order, granted the Secretary's counterclaim for the exact recapture amount owed by Whitecliff and rejected appellant's contention that the counterclaim was barred by principles of *res judicata* and by the applicable statute of limitations.[2] The court reasoned that though there had been a 1989 suit in which the Secretary recovered Medicare overpayments for the years 1980–82, the depreciation payments sought here were not part of the same matter. And, although the Secretary failed to bring a suit for the counterclaim within six years of the cost report, the Secretary had brought the action within one year after a final decision had been rendered by the Secretary, and thus was not time-barred. 28 U.S.C. § 2415(a) (1988). Appellant appealed both of the district court's orders to us.

## II.

Appellant argues that the Secretary's regulation (as the Secretary interprets it) is not consistent with the governing statute in two respects. According to appellant, the recapture regulation, 42 C.F.R. § 405.415(f) (1982), was promulgated under 42 U.S.C. § 1395x(v)(1)(A)(ii) (1988) [section (ii)], which only authorizes "suitable retroactive corrective adjustments where, for a provider of services for any fiscal period, the aggregate reimbursement produced by the meth-

disposition of this case occurred before Congress blessed the Secretary's recapture regulations.

2. Presumably, the Secretary counterclaimed because there was no self-enforcing mechanism which acted to compel Whitecliff to remit the amount determined by the intermediary.

ods of determining costs proves to be either inadequate or excessive." , See also Good Samaritan Hosp. v. Shalala, —— U.S. ——, ——, ——, 113 S.Ct. 2151, 2157, 2159, 124 L.Ed.2d 368 (1993). In other words, appellant asserts that section (ii) only permits the Department to recapture at year's end the excessive reimbursement paid out in that prior year. Hence, the Secretary's attempt to recover depreciation payments made to Whitecliff in previous years was without statutory basis.

▮ This contention is unpersuasive. As the government points out, the recapture regulation was not promulgated solely under the auspices of section (ii). The Secretary relied upon 42 U.S.C. § 1395x(v) generally—which includes section (ii)—and also upon section 1395hh. See 31 Fed.Reg. 7864 (1966) (citing inter alia §§ 1861(v) and 1871 of the Social Security Act as the authority for the regulations). Section 1395x(v)(1)(A) authorizes the Secretary to issue regulations setting the methods to be used in ascertaining the reasonable costs of providing Medicare services. 42 U.S.C. § 1395x(v)(1)(A) (1988). And under section 1395hh, the Secretary has general authority to prescribe regulations "as may be necessary to carry out .the administration of" Medicare. 42 U.S.C. § 1395hh (1988).

Taken together, these sections provide ample authority to support regulations designed to recapture supposedly excessive depreciation at the time of sale of the depreciated asset rather than on a year-to-year basis. The Secretary is to reimburse providers for the cost actually incurred in providing Medicare services. 42 U.S.C. § 1395x(v)(1)(A) (1988). Having determined, (quite correctly in our view) that depreciation of buildings and equipment is a "cost" of Medicare service, the Secretary, rather than requiring a particular depreciation methodology, allowed providers to calculate depreciation using the straight-line method, declining balance method, or accelerated depreciation. 42 C.F.R. § 405.415(a)(3)(i)–(iii) (1982). Recognizing that any of these methods may sometimes understate or overstate the costs of service and that HHS is charged with only giving providers "the cost actually incurred," the

Secretary established a system whereby depreciation would be recalculated when the asset was subsequently sold so as to determine more precisely the actual costs incurred.

While it is true that the Secretary in Good Samaritan had argued that section (ii) enabled HHS to recoup "[a]t year's end" excessive payments to service providers, —— U.S. at ——, 113 S.Ct. at 2157, that claim was made in the context of recouping interim payments made for the routine costs incurred by providers (such as labor costs, etc.). Where, as here, the Secretary attempts to discern the physical wear and tear on facilities, costs not so easily susceptible to yearly determinations, a correction in depreciation payments made at the time of the sale seems administratively desirable and statutorily permissible.

Appellant's second argument—that the Secretary's policy of recapturing of depreciation allows the Secretary to, in effect, refuse to reimburse costs actually incurred by providers and is thus contrary to the statute—is much more compelling. It will be recalled that the recapture regulation states that if "disposal of a depreciable asset results in a gain or loss, an adjustment is necessary in the provider's allowable cost." 42 C.F.R. § 405.415(f)(1) (1982). In implementing this regulation and the statute, the Secretary asserts that there has been a gain whenever the sales prices exceeds the depreciated basis. And if there is a gain, the Secretary recaptures the gain up to the total amount of depreciation payments already made.

Appellant insists that this method of recapturing depreciation payments when there is a gain on the sale of property does not properly account for the fact that the facility is "used up" or "consumed" when Medicare services are provided on the premises. The Secretary's method, it is argued, ignores other factors that might explain why an asset was sold for more than its depreciated basis. Inflation, governmental regulation of entry, and the inexorable forces of supply and demand all impact on the sales price of a facility, and the Secretary's method of determining whether depreciation payments have been excessive takes none of these factors

into account. In the case of Whitecliff Manor, the Board concluded that because the sale price exceeded the depreciated basis, there had been a gain, indicating *per se* that past depreciation payments had been too generous. Whitecliff, however, asserts that the sales price reflects many other factors that the Board ignored in determining that depreciation payments ought to be recouped.

HHS responds that appellant's argument focuses on the wrong question. While it may be true that physical assets are being "consumed" when patient care is provided, the proper question is whether that consumption results in an actual cost to the provider. After all, HHS is charged with reimbursing costs incurred, not consumption of a facility. Where there has been no decline in the *value* of buildings and equipment despite their use for provision of Medicare services, there should be no reimbursement for consumption. The Secretary recognizes that her recapture policy ignores market factors and inflation. But she is only charged with reimbursing costs, and where an asset is sold for more than its depreciated basis, there either has been less cost associated with use of the asset or, in certain situations, no cost at all. In any case, the statute simply does not require that inflation and market factors be taken into account when determining the cost associated with the use of an asset.

The Secretary reminds us that we are obliged under *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) to defer to an agency's reasonable interpretation of ambiguous statutory language. She contends that both the phrases "reasonable cost" and "cost actually incurred" are terms that admit different interpretations, and the Secretary's interpretation is a permissible one. The reasonableness of the cost, however, is not even at issue in this case. As we

have noted, the term reasonable cost is defined in the statute as "the cost actually incurred, *excluding* therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services." Under the statute, then, the "reasonableness" of the cost refers to the provider's need to incur that cost. The Secretary has not contended that the equipment and facilities used by Whitecliff are not "necessary" in the delivery of health services. The question that is before us is whether Whitecliff incurred any "actual cost" in using those assets. Admittedly, that phrase—actual cost—is itself subject to different interpretations but the Secretary concedes that depreciation generally is an "actual cost" within the meaning of the statute. That brings us to the core question: Is it reasonable (*Chevron* Step II) for the Secretary to determine that there has been no "actual cost" where an asset used in the provision of Medicare services is sold for a "gain", i.e. where an asset is sold for more than its depreciated basis? We think that the Secretary's indiscriminate equation of the concept of cost with diminished value *simpliciter*—that is, without regard to the *cause* of the diminution—is simply illogical, without any economic or accounting support and therefore an unreasonable interpretation of the phrase "cost actually incurred."

When hospitals are used to provide services, the equipment and facilities are consumed and therefore costs are necessarily incurred.[3] Buyers are likely to discount the value of the hospital because of the undesirable wear and tear on the assets that accompanies use of that hospital. All other things being equal, this will mean that a used hospital will be sold for less than the amount originally paid for it.

But all other things are virtually never equal. The price of a hospital sold many years after it was purchased will reflect a host of factors other than depreciation or

---

**3.** We can only think of limited exceptions to this general rule. If a depreciated facility was steadily used up over the years of providing service, yet it became more valuable *because* it was consumed, consumption of the asset would not be a cost, but rather a benefit of sorts. For instance, suppose hospital facilities were akin to the used baseball glove of Lou Gehrig. A glove used by

the Iron Horse may well be worth more than a glove merely owned by him and never used. That is so because the "consumed" Gehrig glove has more sentimental attachment to baseball fans than a glove owned by Gehrig though never worn. The broken-in glove has been used by Gehrig, yet there has been no cost associated with that use; in fact, there has been a benefit.

wear and tear. As the Eleventh Circuit has recognized,

> [t]he subsequent sale of the unconsumed remainder of the depreciable assets at a price in excess of their depreciated book value does not necessarily imply ... that the provider did not actually incur some portion of the costs it was reimbursed for the consumption of the asset before it was sold.

*Mercy Community Hosp. v. Heckler,* 781 F.2d 1552, 1557 (11th Cir.1986). For instance, the role of inflation cannot be overlooked. *See generally id.* at 1558 (discussing the role of inflation in sales price). Changes in the availability of building materials and appropriate hospital sites will also be reflected in price. *See id.* (noting that market supply and demand will affect sales price). With respect to the sale of Whitecliff Manor itself, appellant points to still other factors that affected the sales price. The government had imposed a moratorium on the issuance of certificates of need (certificates which permit the construction of new nursing homes) the effect of which was to raise the market price of existing nursing facilities. And the purchaser was unable to secure financing except through the existing owner which undoubtedly also led to a higher sales price. In short, a purchase in which the sales price exceeds the depreciated basis does not necessarily indicate that depreciation payments made in the past have been excessive. The two figures are, or at least may be, as apples and oranges are to each other.

In effect, the Secretary's reading of the statute assumes that the Department not only has the authority to recapture excessive depreciation payments (that is, those payments made in excess of actual costs), but also the power to capture gains in the asset's market value. The interpretation seems to be akin to the Internal Revenue Service's ability to capture gains on the sale of a depreciated asset. As appellant emphasizes, however, the Internal Revenue Code explicitly calls for capturing part of the gain on the sale of assets. 26 U.S.C. §§ 61(a)(3), 1001(a), 1011(a), 1012, 1016(a)(2) (1988). That is the whole point of the Code—to tax gains in income. HHS, on the other hand, is only authorized to reimburse costs of service. If the Department has given too much money for the provision of services, the funds can be recaptured to ensure that only actual costs incurred are reimbursed. However, when the Secretary of HHS attempts to capture gains on the sale of assets, as opposed to merely recapturing excessive cost payments, she acts like the Commissioner of the Internal Revenue—but without the requisite statutory authority.

To be sure, the recapture interpretation is a simple administrative method to determine whether or not depreciation has been excessive (or too sparing)—much easier than considering the various factors that might impact on the sales price and then isolating the cost of consumption. And we recognize that other circuits have deferred to the Secretary's method of looking only to differences between sales price and depreciated basis. *See Creighton Omaha Regional Health Care Corp. v. Sullivan,* 950 F.2d 563, 565–66 (8th Cir.1991); *Stewards Foundation v. United States,* 654 F.2d 28, 33, 228 Ct.Cl. 89 (1981); *Professional Medical Care Home, Inc. v. Harris,* 644 F.2d 589, 593–94 (7th Cir.1980). *See also Hoodkroft,* 879 F.2d 968, 972–73 (1st Cir.1989) (finding analogous Medicaid recapture rules reasonable). *But see Mercy,* 781 F.2d at 1557 (actual costs incurred are not being reimbursed where costs of consumption are not being reimbursed by the Secretary). The understandable need for administrative simplicity, however, does not enable the Secretary to skirt Congress' decision that "the cost actually incurred" be granted to the Medicare providers. In any case, at oral argument appellee's counsel agreed that it was administratively feasible to use other approaches when reappraising the cost of depreciation at the time of the asset's sale.

We would be obliged to defer to any such approach—so long as it was not conceptually flawed. It may well be, for instance, that the Secretary was not required to consider inflation and that the Secretary is entitled to develop a technique that reduces administrative costs. But we cannot approve the Secretary's simplistic linking of depreciation costs with diminished value. The two concepts are

just not congruent. Of course, Congress has subsequently explicitly endorsed the Secretary's regulations, so presumably it is not necessary for the Secretary to struggle with the problem in the future.[4] But appellant's claim—based on the old statute—cannot be denied.[5]

\* \* \* \* \* \*

Accordingly, the orders of the district court are reversed, and the district court is instructed to remand to the agency, so that the agency may proceed in accordance with this opinion in determining whether any depreciation payments ought to be recaptured.

*So ordered.*

---

4. We do not think much of appellant's contention that the Secretary's interpretation of the depreciation regulation was unreasonable. It strikes us as eminently reasonable.

5. Thus, we need not consider appellant's argument that the Secretary's counterclaim is barred by *res judicata* and the applicable statute of limitations.