**LAKE MEDICAL CENTER, Plaintiff,**

v.

**Donna E. SHALALA, Secretary of the Department of Health and Human Services, Defendant.**

**No. Civ.A. 96–1389 (TAF).**

United States District Court, District of Columbia.

March 22, 2000.

*MEMORANDUM—DECISION*

FLANNERY, District Judge.

The plaintiff, nominally Lake Medical Center ("Lake Medical") but in fact its former owner Nu–Med, Inc. (hereinafter "Nu–Med" or "plaintiff") brings this action seeking review of the decision of Donna E. Shalala, Secretary of the Department of Health and Human Services (hereinafter "the Secretary" or "defendant") regarding the amount of reimbursement plaintiff is owed under Medicare, the federal health insurance program for the aged and disabled. 42 U.S.C. §§ 1395 *et seq.* Under Medicare, the Secretary will reimburse providers of health care services for the "reasonable cost" of furnishing such services to Medicare beneficiaries. 42 U.S.C. § 1395f(b)(1). Plaintiff seeks such reimbursement for a loss it suffered when it resold Lake Medical, a hospital licensed to provide Medicare services, for substantially less than it had originally purchased it.

Specifically, in April of 1985, plaintiff acquired the assets of Lake Medical for approximately $29 million, and subsequently invested an additional $11 million in land improvements, for a total investment of about $40 million. In 1988, plaintiff resold Lake Medical for only $14.4 million.

Defendant has already determined that plaintiff has suffered a reimbursable loss on the resale. However, plaintiff asserts that defendant miscalculated the amount of loss. Both plaintiff and defendant have moved for summary judgment. Upon careful consideration of the administrative record, the briefings and the oral argument, the Court finds that the Secretary committed no error. Judgment is therefore granted to defendant.

*I. Regulatory Background*

Under the Medicare statute, a provider is entitled to claim as a reimbursable cost the depreciation (i.e. the loss of value over time) of the building and equipment used to provide health care to Medicare pa-

tients. 42 C.F.R. § 413.134(a). An asset's depreciable value is set initially at its "historical cost," generally equal to the purchase price. 42 C.F.R. § 413.134(a)(2), (b)(1). To determine annual depreciation, the historical cost is then prorated over the asset's estimated useful life in accordance with one of several methods. 42 C.F.R. § 413.134(a)(3). The simplest is the "straight-line" method, which assigns equal amounts of the historical cost to each year of the asset's useful life. 42 C.F.R. § 413.134(b)(3). Providers are then reimbursed on an annual basis for a percentage of the yearly depreciation equal to the percentage of the asset used for the care of Medicare patients.

The calculated annual depreciation is only an estimate of the asset's declining value. If a asset is ultimately sold by the provider for less than the depreciated basis calculated under Medicare (equivalent to the "net book value" and equal to the historical cost minus the depreciation previously paid, *see* 42 C.F.R. § 413.134(b)(9)), then a "loss" has occurred since the sales price was less than the estimated remaining value.[1] In that event, the Secretary assumes that more depreciation has occurred than was originally estimated and accordingly provides additional reimbursement to the provider. Conversely, if the asset is sold for more than its depreciated basis, then a "gain" has occurred and the Secretary takes back or "recaptures" previously paid reimbursement. 42 C.F.R. § 405.415(f)(1); *see Whitecliff, Inc. v. Shalala*, 20 F.3d 488, 489 (D.C.Cir.1994). Plaintiff alleges that defendant's calculation of this depreciation adjustment in con-

nection with the resale of Lake Medical is incorrect.

Two further aspects of the loss calculation as performed by defendant are relevant in deciding plaintiff's claims. The first is an additional limit on depreciation reimbursement which Congress added in July of 1984 as part of the Deficit Reduction Act of 1984 ("DEFRA"), Pub.L. No. 98–369, § 2314(a), 99 Stat. 494 (July 18, 1984), incorporated at 42 U.S.C. § 1395x(v)(1)(O)(i) (1988). This provision limited an asset's "historical cost" (and thus its depreciable basis) to the lesser of the purchase price of the current owner and the purchase price of the owner as of July 18, 1984 (referred to hereinafter as the "DEFRA limit").[2] Thus, in this case, even though Nu–Med bought Lake Medical Center in 1985 for $29 million, its depreciable basis was initially (prior to Nu–Med's land improvements) capped at $11 million, the price paid by the owner as of July 18, 1984, and plaintiff's annual depreciation was calculated based on this DEFRA-limited historical cost. After the resale, defendant also calculated plaintiff's loss based not on plaintiff's own purchase price but on the DEFRA-limited historical cost, i.e. the previous owner's purchase price. Plaintiff now asserts that defendant should not have applied the DEFRA-limit in calculating its loss.

The second relevant aspect of the calculation is the procedure for calculating the loss when several assets are sold together for a lump sum price. Defendant calculates depreciation adjustment on an individual asset basis, comparing each asset's

---

1. The value of the historical basis minus the depreciation has alternately been referred to as the "depreciated basis," *see Whitecliff, Inc. v. Shalala*, 20 F.3d 488, 489 (D.C.Cir.1994), the "undepreciated basis," *see* Pl.Mem. at 18; 42 C.F.R. § 413.134(f)(1), and the "net book value," *see* 42 C.F.R. § 413.134(b)(9). As there does not appear to be any dispute that these three terms refer to the same value, the Court will use the terms "net book value" or "depreciated basis."

2. The relevant provision provides:

> In establishing an appropriate allowance for depreciation ... with respect to an asset of a hospital ... which has undergone a change of ownership, such regulations shall provide ... that the valuation of the asset after such change of ownership shall be the lesser of the allowable acquisition cost of such asset to the owner of record as of July 18, 1984 ... or the acquisition cost of such asset to the new owner.
>
> 42 U.S.C. § 1395x(v)(1)(O)(i) (1988).

net book value with its individual sales price. Here, however, plaintiff sold a group of assets, including the Lake Medical building and equipment, as well as the land, goodwill, an adjacent medical office building and the facility's medical records, for a lump sum of $14.4 million.

Where several assets are sold together for a lump sum, depreciation adjustment for each individual asset is calculated by first allocating a part of the lump sum to each asset "in accordance with [its] fair market value ... as it was used by the provider at the time of sale." 42 C.F.R. § 413.134(f)(2)(iv). An appropriate part of the purchase price is allocated to "all the assets sold" regardless of whether they are depreciable (and thus Medicare-reimbursable) or nondepreciable. Where depreciable and non-depreciable assets are sold together, the allocation of the lump sum can effect the ultimate calculation of loss because any allocation to the non-depreciable assets results in a smaller sales price being allocated to the Medicare-reimbursable assets, and thus a higher calculated loss. Here, for example, the medical office building was not a depreciable asset, but because it was part of the sale of assets, it was allocated a portion of the purchase price decreasing the price allocated to the depreciable assets.

However, defendant did not allocate any of the purchase price to the medical records, although they were listed in the sales agreement among the assets sold and despite the fact that an expert appraisal ordered by the Board determined the medical records to have a fair market value of $1,500,000. Plaintiff asserts that because of the failure to allocate any of the lump sum to the medical records, defendant's calculation of the loss is too low.

The amount of a provider's loss is initially calculated by a fiscal "intermediary," a private entity hired by the defendant to address Medicare reimbursement claims. A provider may appeal this calculation to the Provider Reimbursement Review Board ("Board"), whose decision is final unless reviewed by the Deputy Administrator of the Health Care Financing Administration ("HCFA"). 42 U.S.C. § 1395oo(f). In this case, the intermediary found that plaintiff's total loss, in light of the DEFRA limit and after refusing to allocate any of the lump sum to medical records, was equal to $1,757,660.[3] The Board affirmed the result on September 26, 1997.

Plaintiff claims that without the erroneous application of the DEFRA limit, its loss is in excess of $10 million. Further, plaintiff asserts that even accepting defendant's application of the DEFRA limit, an allocation of an appropriate amount of the purchase price to the medical records results in a loss of $2,918,260 instead of $1,757,660.

## II. Discussion

### A. Standard of Review

Pursuant to 42 U.S.C. § 1395oo(f)(1), the Secretary's final decisions on provider reimbursement under the Medicare Act are reviewed under the standards of the Administrative Procedures Act ("APA"), 5 U.S.C. §§ 701 et seq. *See Sentara–Hampton General Hospital v. Sullivan, M.D.*, 980 F.2d 749, 754 (D.C.Cir.1992). Under the APA, a reviewing court may set aside an administrative decision only if the decision is arbitrary, capricious, an abuse of discretion, unsupported by substantial evidence, or otherwise not in accordance with the law. 5 U.S.C. § 706(2)(A) and (E); *see Sentara–Hampton General Hospital*, 980 F.2d at 754.

▮▮▮ Where a party is challenging the Secretary's construction of the Medicare Act, the Secretary's interpretation is entitled to "great deference." *Id.*, 980 F.2d at 754 (internal quotations omitted). The Court must defer to that interpretation "so

---

**3.** Plaintiff's actual reimbursement would be a percentage of its total loss equal to the percentage of the assets used for Medicare purposes.

long as it is reasonable, consistent with the statutory purpose, and not in conflict with the statute's plain language." *OSG Bulk Ships, Inc. v. U.S.,* 132 F.3d 808, 814 (D.C.Cir.1998) (citation and internal quotations omitted); *see Chevron U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 845, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). A court is not to impose its own construction, but merely determine whether the "agency's answer is based on a permissible construction of the statute." *Chevron U.S.A., Inc.,* 467 U.S. at 843–44, 104 S.Ct. 2778; *see also Marymount Hospital, Inc. v. Shalala,* 19 F.3d 658, 661 (D.C.Cir.1994). Similarly, an agency's interpretation of its own regulations "will prevail unless it is 'plainly erroneous or inconsistent' with the plain terms of the disputed regulations." *Everett v. U.S.,* 158 F.3d 1364, 1367 (D.C.Cir.1998) (citation omitted). With these standards in mind, the Court turns to plaintiff's arguments.

## B. Application of the DEFRA limit

Plaintiff argues that defendant has wrongfully applied the DEFRA limit in its gain/loss calculation. Defendant calculated the depreciation loss by taking the DEFRA-limited net book value of each asset, and comparing it with the asset's allocated purchase price. Although plaintiff acknowledges 42 U.S.C. § 1395x(v)(1)(O)(i) limits plaintiff's historical cost basis for purposes of determining its annual depreciation payments, plaintiff argues that the following subsection, § 1395x(v)(1)(O)(ii), prohibits application of the DEFRA limit to the depreciated cost basis in the gain/loss calculation. That provisions states that "regulations shall provide for recapture of depreciation in the same manner as provided under the regulations in effect on June 1, 1984." 42 U.S.C. § 1395x(v)(1)(O)(ii) (1988).[4] Both parties concede that "recapture of depreciation" in this provision should be construed to refer to the gain/loss calculation generally. Plaintiff argues that in the regulations in effect on June 1, 1984, there was no DEFRA limit, and therefore, none should be applied in the gain/loss calculation now.

The Court finds, however, that defendant's application of the DEFRA limit in its gain/loss calculation is a reasonable interpretation of § 1395x(v)(1)(O)(ii)'s directive to continue recapture in the manner provided for by June, 1984 regulations. The critical recapture regulation stated in part that "[i]f a disposal of a depreciable asset results in a gain or loss, an adjustment is necessary in the provider's allowable cost." 42 C.F.R. § 405.415 (1984). As the D.C. Circuit noted in *Whitecliff, Inc. v. Shalala,* 20 F.3d 488 (D.C.Cir.1994), under this regulation, the Secretary calculated loss or gain by comparing the sales price of the asset with its depreciated basis, which is the historical cost basis minus the depreciation. *Id.* at 489 (emphasis added); 42 C.F.R. § 413.134(a)(2) (defining the equivalent term "net book value"). Defendant's interpretation does reasonably continue to calculate gain/loss in this same manner, in that defendant continues to compare the sales price with the depreciated historical basis as defined by her existing regulations. It is conceded that under the regulations, plaintiff's "historical basis" is limited by DEFRA. *See* 42 C.F.R. § 413.134(b)(1)(ii).

Plaintiff asserts that defendant must calculate historical basis as it would have been calculated under regulations prior to DEFRA. However, defendant is not unreasonable in concluding that it should calculate depreciation adjustment based on the current regulatory definition of "historical cost," which is the same definition it uses in determining plaintiff's annual depreciation allowance. First, there is no suggestion that defendant did not apply the same historical cost definition in both

4. This section was modified by Congress in 1997. *See* Pub.L. No. 105–33, § 4404(a), 111 Stat. 251 (Aug. 5, 1997); *see also* 42 U.S.C.A. § 1395x(v)(1)(O) (West Supp.1999) (codifying current provision). However, the parties do not dispute that DEFRA provisions were applicable at the time of the transactions at issue here.

contexts in 1984 and in that sense follows the same procedure now. Further, to follow plaintiff's interpretation would require defendant to value an asset at its actual historical cost for annual depreciation purposes throughout the period when a provider was using the asset, and then suddenly reject this valuation when adjusting that same depreciation on resale. Defendant's approach, by comparison, is far more conceptually consistent; defendant simply treats historical cost uniformly at all points in the calculation of depreciation. This is an eminently reasonable approach on its face.

The reasonableness of this uniform treatment of historical cost is also bolstered by the text of § 1395x(v)(1)(O)(i), which directs the Secretary to apply the DEFRA limit when "establishing an appropriate allowance for depreciation." 42 U.S.C. § 1395x(v)(1)(O)(i). Although plaintiff would restrict the meaning of "an appropriate allowance for depreciation" to the calculation of the annual depreciation allowance and exclude the subsequent depreciation adjustment, these are most reasonably understood as two phases of the same overall determination of allowable depreciation costs. In making a final depreciation adjustment, the Secretary is still making a calculation intended to determine "an appropriate allowance for depreciation." Thus, application of the DEFRA limit to determine both the annual depreciation payments and the ultimate depreciation adjustment is reasonable.

Plaintiff argues that its interpretation is the only reasonable one. Plaintiff argues that gain or loss should be calculated without any reference to DEFRA. Plaintiff asserts that the historical cost should be limited only by plaintiff's own purchase price, the asset's reproduction costs and the asset's fair market value, Pl.Mem. at 20, and that the DEFRA limit (in this case, the previous owner's acquisition cost) was "not intended to have an effect on the calculation of a Medicare gain or loss on the sale of an asset." Pl.Mem. at 17 (emphasis added). This is an unreasonable interpretation because by allowing plaintiff to recover loss up to its own purchase price, it would substantially defeat the intention of Congress. In the Congressional Conference Report, it was stated:

> The conferees are concerned that Medicare has been paying for the same capital assets more than once. Thus, *the provision [codified at 1395x(v)(1)(O)(i) ] is intended to limit the revaluation of an asset* to the cost of acquisition to the individual or entity who is the owner, for medicare purposes, at the time of enactment of the legislation.

H.R.Conf.Rep. 98–861 at 1339, *reprinted in* 1984 U.S.S.C.A.N. 1445, 2027 (emphasis added). Under plaintiff's interpretation, the effect of the DEFRA limit is chiefly to put off this revaluation until resale. Plaintiff's interpretation would still allow it to eventually obtain the revaluation that Congress intended to preclude.[5]

5. Before the Board, plaintiff offered a different interpretation. Under this interpretation, the DEFRA limit is still used in the gain/loss determination to calculate the net book value of the reimbursable assets. Thus, plaintiff's total reimbursement after the depreciation adjustment is still capped by the DEFRA limit. *See* Admin.Rec. at 140 ("There is no argument that there's a limitation to the full depreciation amount at whatever the DEFRA limit is.") However, plaintiff asserts that defendant misapplied DEFRA in allocating the lump sum purchase price. As noted earlier, where a group of assets are sold for a lump sum, defendant calculates the loss on an individual asset by first allocating a portion of the lump sum to the asset in accordance with its

fair market value. Plaintiff asserts that under DEFRA, each physical asset should be treated for allocation purposes as two assets: a depreciable DEFRA-limited asset, and a second non-depreciable asset consisting of the acquisition cost of the physical asset above the DEFRA limit (hereinafter, the "non-DEFRA asset"). Then, according to plaintiff, a portion of the lump sum must be allocated to the non-DEFRA asset, thus decreasing the price allocated to the reimbursable DEFRA-limited asset and increasing the calculated reimbursable loss. *See* Admin.Trans. at 140–45 (testimony of plaintiff's Medicare expert, discussing interpretation), Supp.Admin.Trans. at 27 (plaintiff asserting that "[t]he fiscal intermedi-

Plaintiff argues that its interpretation has been expressly adopted by the Secretary's current regulations. Plaintiff points to two excerpts from the Secretary's Medicare Intermediary Manual ("Manual"), which is issued to give intermediaries direction in calculating reimbursable costs. Even assuming that the Manual is binding, however, the statements plaintiff relies on do not advance its position. The first statement is that "[a]djustment to depreciation (i.e., the gain or loss) computation is based upon Medicare rules in effect on June 1, 1984." Admin.Rec. at 76. This is a merely a restatement of the DEFRA provision which defendant has reasonably interpreted. Plaintiff's second excerpt states that "the gain/loss computation to be applied to the seller is *always* based upon the *allocated purchase price*, regardless of the limitation which will be applied to the buyer for revaluation of assets." Admin.Rec. at 74 (emphasis in original). Plaintiff asserts that this is a clear statement that the gain/loss computation is based on *plaintiff's own* purchase price. However, the "purchase" in this context is the purchase *from* plaintiff acting as seller, i.e. plaintiff's *resale of the asset*. Thus, the statement merely confirms that the loss should be determined by comparing the asset's net book value with the allocated *resale price* of the asset.

Because defendant's interpretation of the DEFRA provisions and the relevant provisions of its internal Manual is reasonable and consistent with the plain language of those provisions, plaintiff's first claim of error is rejected.

## C. Allocation of the Purchase Price to the Medical Records

The regulations specifically provide that the allocation of the lump sum price must be "among *all the assets sold* in accordance with the fair market value of each asset...." 42 C.F.R. § 413.134(f)(2)(iv) (1999) (emphasis added). Plaintiff asserts that the medical records were assets sold. Further, pursuant to an expert appraisal performed at defendant's direction, the fair market value of the medical records was calculated as $1,500,000. Nevertheless, defendant declined to allocate any of the purchase price to the medical records. Plaintiff asserts that this was an error.

Defendant's view is that the term "assets sold" chiefly refers to "tangible" assets. She asserts that under the regulation, intangible assets such as medical records are treated as equivalent to "going concern" value, and asserts that "going concern" should be considered a "sold asset" and assigned a portion of the purchase price only if that purchase price exceeds the value of the "tangible" assets. In that event, the excess or "residual" value is assigned to going concern.

Although presented in broad terms, defendant's reasoning is most appropriately reviewed as a factual conclusion, i.e. a conclusion that the medical records only have a "going concern" value and that in this case, the buyer should not be considered to have paid anything for the "going concern" value of the facility. *Cf. Universal Health Services of Nevada, Inc. v. Sullivan*, 1992 WL 465444 (D.D.C.1992), (reviewing for substantial evidence defendant's assertion

---

ary has ... chosen to allocate the entire sale price of $14,400,000.00 only among the Medicare allowed portion of the assets, as limited by DEFRA" and that [i]n order to abide by [governing Medicare] principles, the sale price must be allocated among the value of all assets, including ... "the so-called 'Non–DEFRA limited portion of the assets.' ").

Defendant was reasonable in rejecting this approach, however. The approach is not even consistent with plaintiff's own fundamental premise that the calculation of loss or

gain should be performed completely unaffected by the DEFRA limit. Further, although plaintiff maintains that adjustment should be calculated in the same manner as in June of 1984, it does not argue that at that time, the Secretary was splitting each real depreciable asset into two separate assets for accounting purposes. Given that plaintiff's approach is not even consistent with its own view of DEFRA, the Secretary was certainly not unreasonable in rejecting it.

that medical records were typically "expensed" and therefore could not be claimed as depreciable assets), *aff'd,* 18 F.3d 954, 1994 WL 47155 (D.C.Cir.1994) (unpublished opinion).

■■■ "Substantial evidence" is evidence which a "reasonable mind might accept" as "adequate to support a conclusion." *Dickinson v. Zurko,* 527 U.S. 150, 119 S.Ct. 1816, 1823, 144 L.Ed.2d 143 (1999) (citation and internal quotations omitted). This is something less than the "weight of the evidence" and the "possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Federal Maritime Comm'n,* 383 U.S. 607, 620, 86 S.Ct. 1018, 16 L.Ed.2d 131 (1966).

The conclusion that the buyer did not provide any consideration for Lake Medical as a going concern is reasonable in light of the evidence. "Going concern" value refers to a market determination that a business in operation is worth more than the fair market value of its separately sold assets. *See North Clackamas Community Hospital v. Harris,* 664 F.2d 701, 705 (9th Cir.1980) (Kennedy, J.) (noting Board's view that going concern value is "an amount the Provider was willing to pay beyond the fair market value of specific identifiable tangible assets in order to conduct its business" and observing that this view was "in accordance with standard accounting practices"); *Dakota Midland Hospital v. Blue Cross and Blue Shield Association/Blue Cross and Blue Shield of Iowa,* No. 97–D72, 1997 WL 383652, *5 (P.R.R.B. June 25, 1997). If the purchase price is less than the fair market liquidation value, then it is reasonable to assume that no premium was paid to obtain the business as a going concern. Here, the expert appraisal established that the lump sum sales price was less than the fair market value of the tangible assets. The Board's finding that there was no going concern value therefore must be upheld.

Indeed, the plaintiff has not challenged this conclusion.

■■■ The only question, then, is whether defendant's conclusion that medical records are intangible assets which possess, at most, a going concern value is supported by the evidence. The Court finds that it is. The appraiser noted several uses of medical records which contributed to its conclusion that the records had value. It noted that records

> provide the Medical Center and its health care practitioners with an invaluable source of information concerning the status and progression of health issues affecting each patient.... Additionally, these clinical medical records serve as a repository of medical information that is essential in responding to third-party inquiries regarding the care and treatments rendered. The nature and sources of these inquiries are diverse and typically arise from third-party payors, peer review and research organizations, and state medical societies, as well as from potential medical malpractice litigants.

Supp.Admin.Rec. at 76. These noted uses are consistent with the conclusion that the records were valuable *solely for their use by Lake Medical as a going concern.* Conversely, the appraiser did not suggest that the records could be valued as an asset independent of Lake Medical's ongoing operations. The Court concludes that the Board had sufficient basis to conclude that the medical records have only going concern value and that the medical records were not a sold asset for that reason.

It is true that the sales agreement listed medical records among the "assets sold." Admin.Rec. at 56. However, the agreement also listed many other such "sold assets" including good will, licenses, surveys, building plans, patient and staff lists, title to "Certificates," and work product. Admin.Rec. at 56. Even plaintiff does not suggest that any of these should also have been accorded a fair market value and

allocated a portion of the sales price. The mere mention of the medical records as "assets" establishes only that the records were intended to be among the assets transferred in the sale, not that they specifically were sold for independent value. Indeed, the Board heard at least some testimony to the contrary from an agent of the intermediary. *See* Admin.Rec. at 214 ("Q: And there's no indication that [the buyer] when it paid 14.4 for the hospital assets received some value of that 14.4 for the medical records, is that correct? A: That's correct.").

Plaintiff notes that in *Universal Health Services of Nevada, Inc. v. Sullivan*, 1992 WL 465444 (D.D.C.1992), *aff'd*, 1994 WL 47155 (D.C.Cir.1994) (unpublished opinion), the district court observed that expert testimony had established that "purchasers of hospitals *reflect medical records as an asset* and *amortize the acquisition cost* over the asset's useful life." *Id.*, 1992 WL 465444, *8 (emphasis added). Here, however, there is no evidence that the buyer associated any acquisition cost with the medical records specifically. Although the Board has previously found that an agreement between a buyer and seller regarding allocation of the purchase price to medical records is controlling in the loss/gain calculation, *see Sullivan Community Hospital v. Blue Cross and Blue Shield Assoc.*, No. 94–D31, 1994 WL 928170, *6–7 (P.R.R.B. April 26, 1994), it is undisputed that there is no such agreement in this case.

In sum, the Court finds that the defendant's determination is supported by substantial evidence. Plaintiff's second claim of error must therefore also be rejected and the Secretary's decision upheld in all challenged respects. An appropriate order will accompany this decision.

### ORDER

It is hereby

**ORDERED** that plaintiff's motion for summary judgment (22) is DENIED; and it is further

**ORDERED** that defendant's motion for summary judgment (26) is GRANTED and the action is dismissed in its entirety.