**LAKE MEDICAL CENTER, Appellant,**

v.

**Tommy G. THOMPSON, Secretary of the Department of Health and Human Services, Appellee.**

No. 00–5141.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 30, 2000.

Decided March 23, 2001.

Patric Hooper argued the cause and filed the briefs for appellant.

Sonia M. Orfield, Attorney, U.S. Department of Health and Human Services, argued the cause for appellee. With her on the brief were Harriet S. Rabb, General Counsel, Sheree R. Kanner, Associate General Counsel, Henry R. Goldberg, Deputy Associate General Counsel, David W. Ogden, Assistant Attorney General, U.S. Department of Justice, and Wilma A. Lewis, U.S. Attorney.

Before: EDWARDS, Chief Judge, SENTELLE and RANDOLPH, Circuit Judges.

Opinion for the Court filed by Circuit Judge RANDOLPH.

Opinion concurring in part and dissenting in part filed by Circuit Judge SENTELLE.

RANDOLPH, Circuit Judge:

At issue is the valuation of hospital assets for purposes of reimbursement under the Medicare statute, 42 U.S.C. § 1395 *et seq.* Nu–Med, Inc., through its subsidiary Nu–Med Lake, purchased a general hospital in Florida—the Lake Medical Center—in 1985 for about $29 million. Three years later, Nu–Med sold the medical center and its associated assets to Leesburg Regional Medical Center for $14.4 million.

Medicare providers such as Nu–Med are entitled—with certain limitations not relevant here—to compensation for "the reasonable cost" of services provided to Medicare patients. *See* 42 U.S.C. § 1395f(b)(1). Providers are reimbursed by "fiscal intermediaries"—typically private insurance companies under contract to the Health Care Finance Administration to determine the cost basis of medical service and make periodic payments. *See* 42 C.F.R. § 400.202 (1999). Among the costs reimbursed is the depreciation on buildings and equipment used to provide Medicare services. *See* 42 C.F.R. § 413.134 (1999). The intermediary makes depreciation payments to a provider based on an estimated depreciation method. *See* 42 C.F.R. §§ 413.64(b); 413.134(b) (1999). When an asset is sold, it may become apparent that the intermediary has paid either too much or too little depreciation because the sales price was either higher or lower than expected. *Cf.* GLENN A. WELSCH & CHARLES T. ZLATKOVICH, INTERMEDIATE ACCOUNTING 476 (8th ed.1989) (noting that depreciation is only an estimate). The Medicare regulations permit the intermediary to recover overpayment of depreciation when an asset is sold for more than its cost basis less reimbursed depreciation. *See* 42 C.F.R. § 413.134(f) (1999).

In this case, Nu–Med filed a Medicare cost report on March 18, 1988, and claimed a loss on its sale of the Lake Medical Center. The intermediary, Blue Cross and Blue Shield of Florida, responded with a Notice of Program Reimbursement denying Nu–Med additional payments. Because there was a lump sum sales price, the intermediary allocated the price among the assets and, having done so, calculated a gain on the sale of the depreciable assets. Nu–Med appealed this determination to the Provider Reimbursement Review Board. The Board found that the intermediary had erred in allocating all of the proceeds to depreciable assets, that it should obtain an independent appraisal to establish the fair market value of all the assets, and that it should then allocate the purchase price among the depreciable and nondepreciable assets (such as land) to determine what Nu–Med realized in the sale. *See Lake Medical Ctr. v. Blue Cross & Blue Shield,* No. 96–D28, slip op. at 10 (Provider Reimbursement Review Bd. Apr. 16, 1996). After the intermediary obtained an appraisal, it issued a new Notice of Program Reimbursement calculating Nu–Med's total loss on the sale of $1,757,660. The Board affirmed. *See Lake Medical Ctr. v. Blue Cross & Blue Shield,* No. 97–D107, slip op. at 12 (Provider Reimbursement Review Bd. Sept. 26, 1997). Nu–Med challenged this recalculated loss as too low. The district court (Flannery, J.) rejected Nu–Med's contentions in a thorough and well-reasoned opinion. *See Lake Medical Ctr. v. Shalala,* 89 F.Supp.2d 83 (D.D.C.2000).

I.

For depreciable assets, that is for assets that lose value over time, an owner's gain or loss on the sale of the asset is the difference between the purchase price (the cost basis) less accumulated depreciation (the net book value) and the sales price. *See* WELSCH & ZLATKOVICH, *supra,* at 447. If a provider sells a Medicare-depreciable asset at a loss, the Secretary assumes that more depreciation occurred than originally estimated and therefore provides additional reimbursement to the provider. If a gain results, the Secretary recaptures the previously paid reimbursement. *See Lake Medical Ctr.,* 89 F.Supp.2d at 85.

In 1984, as part of the Deficit Reduction Act or "DEFRA," Congress set a limit on providers' historical cost of assets. *See* Deficit Reduction Act of 1984, Pub.L. No. 98–369, § 2314(a), 99 Stat. 494 (July 18, 1984), *codified* at 42 U.S.C. § 1395x(v)(1)(*O*) (1994). Under 42 U.S.C. § 1395x(v)(1)(*O*)(i),[1] when an asset changed hands, "the valuation of the asset ... shall be the lesser of the allowable acquisition cost of such asset to the owner of record as of July 18, 1984 ... or the acquisition cost of such asset to the new owner." 42 U.S.C. § 1395x(v)(1)(*O*)(i) (1994). A second clause required regulations to "provide for recapture of depreciation in the same manner as provided under the regulations in effect on June 1, 1984." 42 U.S.C. § 1395x(v)(1)(*O*)(ii) (1994).

■ Because Nu–Med sold the Lake Medical Center in 1988, the Board found that the first of these provisions—clause (i)—required the intermediary to consider the cost basis to be the price paid for the facilities by the owner of record in 1984— namely, $11 million. *See Lake Medical Ctr. v. Blue Cross & Blue Shield*, No. 97– D107, slip op. at 10 (Provider Reimbursement Review Bd. Sept. 26, 1997). According to Nu–Med this was error because clause (i) only specifies the basis for calculating the depreciable value of an asset (and thus the periodic reimbursement payments from the intermediary), whereas clause (ii) specifies the method for calculating gain or loss from the sale of an asset. (Both parties agree that even though clause (ii) refers only to "recapture" it applies not only to transactions resulting in a gain but also a loss.) Nu–Med's theory is that clause (i) did not exist in 1984 so the calculation in clause (ii) regarding gain or loss on a sale must ignore the DEFRA cap on historical cost.

The district court rightly rejected Nu– Med's arguments. Nu–Med's interpretation of the interplay between clauses (i)

and (ii) does not exactly leap off the page. The Secretary's reading, on the other hand, is perfectly logical. It treats clause (ii) as dealing with the method of calculating depreciation (the clause uses the word "manner"), and clause (i) as setting the depreciable basis of the asset from which the clause (ii) calculation will be made. It is unnecessary to discuss all of the various regulations in effect in 1984 dealing with the method of calculating depreciation. The district court mentioned one—42 C.F.R. § 405.415 (1984)—which is enough to make the point: as in 1984, the Secretary under DEFRA continued "to compare sales price with the depreciated historical cost basis as defined in [the] existing regulations." *See Lake Medical Ctr.*, 89 F.Supp.2d at 87. The district court gave other reasons for sustaining the Secretary's interpretation but it would serve no useful purpose to repeat them. Even if the case were not so overwhelming in favor of the Secretary's reading, the respect a court must give to an agency's statutory interpretation would cause us to reach the same result. *See National Medical Enters., Inc. v. Shalala*, 43 F.3d 691, 695 (D.C.Cir.1995). Upholding the Secretary here is not inconsistent with the dicta in *Whitecliff, Inc. v. Shalala*, 20 F.3d 488, 489 n. 1 (D.C.Cir.1994), that "the Deficit Reduction Act of 1984 ... codified at 42 U.S.C. § 1395x(v)(1)(*O*)(ii), ratified the recapture of depreciation regulations that were in effect as of June 1, 1984." Clause (ii), as we have said, did "ratify" those 1984 regulations dealing with the manner in which depreciation is calculated.

## II.

■ Nu–Med's alternative contention is that the intermediary's loss valuation was too low because neither it nor the Provider Reimbursement Review Board properly accounted for the value of medical records in determining Nu–Med's reimbursable

---

**1.** The statute was amended in 1997, changing clause (i) and deleting clause (ii). *See* 42

U.S.C. § 1395(v)(1)(*O*) (Supp. IV 1998).

loss. When Nu–Med sold the Lake Medical Center in 1988 for $14.4 million, there was no allocation of the sales price among the buildings, land, equipment, the name "Lake Medical Center," patient files or "good will." Because not all assets are depreciable under Medicare, *see* 42 C.F.R. § 413.134(a) (1999), when assets are sold in a bundle "the gain or loss on the sale of each depreciable asset must be determined by allocating the lump sum sales price among all the assets sold, in accordance with the fair market value of each asset . . . at the time of sale." 42 C.F.R. § 413.134(f)(2)(iv) (1999).

Naturally, Nu–Med would prefer that as much of Lake Medical Center's sale price as possible be apportioned to nondepreciable assets. This would lower the allocable sales price of the depreciable assets, maximizing both Nu–Med's losses and its Medicare cost recovery. To that end, Nu–Med thinks that its reimbursement was inadequate because both the intermediary and the Provider Reimbursement Review Board assigned no value to the medical records transferred as part of the sale. *See Lake Medical Ctr.*, No. 97–D107, slip op. at 12.

It is true that the appraiser placed a fair market value of $1.5 million on the medical records out of a total appraisal of approximately $17 million for the Center, although everything actually sold for $14.4 million. But those numbers show that the purchaser paid nothing for residual going concern value: the tangible assets were sold for less than their fair market value. Medical records are, the Board determined, akin to goodwill, assigned a positive value only when the sales price of the other assets exceeds their fair market value. *See Lake Medical Ctr.*, No. 97–D107, slip op. at 11–12. In this respect the Board's judgment comports with generally accepted accounting practices. *See* FINANCIAL ACCOUNTING STANDARDS BOARD, CURRENT TEXT: ACCOUNTING STANDARDS B50.145; B50.160 (1994) ("goodwill" only recorded when sale price of assets exceeds fair market value); JOHN DOWNES & JORDAN ELLIOT GOODMAN, DICTIONARY OF FINANCE AND INVESTMENT TERMS 239 (5th ed.1998) ("going concern value" recorded as "goodwill" in acquisition accounting). The Board sufficiently supported its conclusion that Nu–Med's medical records could not, as the district court put it, be "valued as an asset independent of Lake Medical's ongoing operations." *See Lake Medical Ctr.*, 89 F.Supp.2d at 90. It is of no moment that the sales agreement includes "all books and records of the facility." The sales agreement also includes "good will," which only exists if the assets are sold for more than fair market value. The mere fact that an asset was transferred does not mean it had a positive fair market value.

We have considered and rejected Nu–Med's other arguments. The judgment of the district court is

*Affirmed.*

SENTELLE, Circuit Judge, concurring in part and dissenting in part:

I concur in most of the well reasoned opinion of the court, but find that I am unable to join Part II. Although I think the result reached by the Secretary, the district court, and the majority is a reasonable one, I do not think it is consistent with governing HHS regulations.

The applicable HHS regulation provides:

If a provider sells more than one asset for a lump sum sales price, the gain or loss on the sale of each depreciable asset must be determined by allocating the lump sum sales price among *all the assets sold,* in accordance with the fair market value of each asset as it was used by the provider at the time of sale. If the buyer and seller cannot agree on an allocation of the sales price, or if they do agree but there is insufficient documentation of the current fair market value of each asset, the intermediary for the selling provider will require an appraisal by an independent appraisal expert to establish the fair market value of

each asset and *will* make an allocation of the sales price in accordance with the appraisal.

42 C.F.R. § 413.134(f)(2)(iv) (emphasis added). The regulation makes no distinction between tangible and intangible assets, nor does it limit the allocation of sale prices to depreciable assets. Most importantly for the purposes of the present controversy, it does not adopt "generally accepted accounting practices." Maj. Op. at 571.

The Secretary's argument that medical records primarily have a "going concern" value and that assets with "going concern" value should not be allocated a portion of the sale price is certainly reasonable, and I accept that following "generally accepted accounting practices" would dictate the result reached by the court. Indeed, were the Secretary to promulgate regulations to that effect, I have little doubt that those regulations would withstand all challenge. But that is not the state of the regulations that governed the sale before us.

As appellant argued, the Secretary's regulations explicitly require the intermediary to allocate the sales price "among *all the assets sold.*" There is little ambiguity in this statement. If the medical records were among "the assets sold" by Nu–Med, then they should be allocated a portion of the sales price. The records were listed as a separate asset at the time of sale even though all of the assets were sold for a lump-sum price.

Since the buyer and seller did not agree on the value, if any, to be assigned to the medical records, the intermediary was required to submit this matter for independent appraisal, which it did. Under the plain language of the regulation, this appraisal, and not "generally accepted accounting practices," controls. The regulatory language leaves no room for the intermediary, or the Secretary, to reallocate portions of the sales price because they disapprove of the appraiser's judgment. While the Secretary's view is most reasonable as a policy matter, it is not the view embodied in the Secretary's own regulations. If the medical records were "intended to be among the assets transferred in the sale" then they were among the "assets sold" and fall under the regulations. That this produces an unreasonable or unconventional result does not give the Secretary or the courts license to rewrite the regulatory language.

In all other respects I join Judge Randolph's careful opinion for the court.